Welcome to the Fifth Circuit. This is the third and final day of this panel sitting for oral arguments, and we have two matters on the docket today. Before we begin, I would advise counsel on those two matters that the panel has received and is very familiar with the briefing done in this case and the issues raised in the briefs, as well as the key case law that you've cited. If you would tailor your remarks accordingly, that would be appreciated. That way you can use your time a little more productively. We have a lighting system here for those who haven't been here before. When the yellow light goes on, you have two minutes remaining, and when the red light goes on, we'd ask that you please conclude the sentence that you're stating, and that would conclude your argument, unless you're responding to a question from a panel member. So the first case is No. 21-40039, United My Funds, LLC v. Mubaidin. Counsel, if you would approach, hopefully I'm pronouncing that name correctly, Hisham Mubaidin. Mr. Champion, you have reserved five minutes for rebuttal and 15 minutes to open, and you may proceed. Thank you. May it please the Court, my name is Austin Champion, and I represent the appellant Hisham Mubaidin. This appeal raises three important issues under Texas law. I'd like to start the argument today with the issue of damages under the Texas Death Liability Act claim. At trial, United My Funds presented no evidence of market value damages to the witness. It didn't call an expert witness. It didn't call a corporate representative to testify regarding market value. It did none of these things, and as a result, the jury was simply left to guess, and it did. It picked a number, $25,000, which was not a number that had been discussed at all at trial, except for the issue of partial payments, which I'll discuss in just a minute. But they were brought up in evidence as the $25,000 payment, several of which were made. That is correct. The evidence does contain testimony and, of course, exhibits regarding partial payment amounts involving an entire transaction that involved or included a lease of property. It included the business, which is referred to as key money, the gas station operations on the property, and the inventory for the property. And I'll come back to that and explore it in just a little bit further. But on appeal, what United My Funds is arguing is that the testimony of Wael Al-Shayef, a prospective purchaser of the property, qualifies, under an exception under Texas law, as property owner testimony. Now, under Texas law, as you know, the property owner is presumed to know what his property is and the value of that property. It's an exception to the general rule regarding qualification of expert testimony. Now, there are limitations under Texas law, and these limitations are consistent with the limitations that we have for any expert testimony. For example, the lay witness has to be an owner of the property. Two, the testimony can't be speculative. The property owner can't stand up and just presume or guess what the property value is just because he's the owner. The witness must provide the factual basis for his valuation. He can't just declare it or say it. And when you talk about a corporate entity, we now know that the witness must be an employee or someone who works for the company with a managerial position that has duties related to the property, and that witness must be personally familiar with the property and its fair market value. This market value testimony that is not meeting these limitations is irrelevant, and irrelevant evidence cannot support a judgment, even if there's no objection at trial. Mr. Al-Shayef's on the record testified that he was a prospective purchaser at the time he viewed some of this property and at the time that he concluded what the property's value was. Second, Mr. Al-Shayef was not personally familiar with the inventory. His testimony about what it was worth was based on evaluation conducted by an unknown third-party appraiser and his knowledge of one of three gas stations. Mr. Al-Shayef never described the inventory or even testified that he knew what it was or what it included. Third, Mr. Al-Shayef did not offer an opinion of market value. He testified that somebody else appraised the property at $100,000, and he believed, and I quote, there was like about $30,000 less what they told me. That's on the record at 1607. He never explained whether this belief as to value was based on market value, wholesale value, intrinsic value to him, retail value, replacement value, or anything. He didn't provide any of that information. And of course, we don't know what the appraiser, third-party appraiser's valuation was based on. Was it based on replacement value, market value, wholesale value? We don't know. He's relying on third-party sources to provide some estimate of some value without providing the jury with any basis for that value, and that would be improper under Texas law. Finally, Mr. Al-Shayef did not explain the basis for his conclusion that the property was worth about $30,000 less than what it was appraised for. He simply declared it, and we know from Texas case law that that's not appropriate. You have to provide the basis for your opinion, just like any expert, or else it's not sufficient evidence and it can't support the judgment. Now, in response, United My Funds briefed and asked this court to conclude that partial payments made by ClickMart for the overall transaction are sufficient evidence of market value damages. And this is just improper. No Texas court has ever looked at partial payments or just payments standing alone and said that that's sufficient evidence of market value damages. We know, in fact, to the contrary, from the Texas Supreme Court, that market value damages must be proven by opinion testimony, period. It must be proven by opinion testimony. Counsel, how much did ClickMart pay for the inventory? We don't know for sure. So on page 29 of your brief, it says it's undisputed that ClickMart paid $100,000 for inventory at the New Mexico stores. That was ClickMart's testimony, and we don't dispute it for the purpose of the appeal. But the testimony at trial was it's $180,000 plus or minus for this transaction, and that's based on the fact that ClickMart testified it made additional wire payments that were disputed at trial. I'm not sure I understand. So there's evidence that ClickMart paid $100,000, which is why you don't dispute it? That's correct. And then there's also testimony to the jury from Mr. Al-Shayef that it's around $70,000. That's correct. Okay. So the jury clearly had $100,000 and it had $70,000. I realize you didn't want the jury to agree with either of those two numbers, and in fact, they didn't agree with either of those two numbers. But there's certainly evidence of $100,000 and there's evidence of $70,000. I think I agree with you, and I would just argue it's not legally sufficient evidence. So here's my real question. Why, if the jury gives $25,000, why would you want a remand under these cases to the trial court, presumably to reform, to have a new judgment that's somewhere between $100,000 and $70,000? That would hurt your client, not help your client. Why would you send it back and say, no, in fact, the evidence is zero? I think there's a misunderstanding either on my part or otherwise, but we're asking for a remand on the issue of attorney's fees only, which I'll come to in a minute. We're asking for a remand to render with respect to the Texas theft liability. Sorry. So you would want a take-nothing judgment as to the inventory value? That's correct. But I don't understand. So the cases that you've cited that overturn these TTLA judgments, when they send them back, they don't get take-nothing judgments. These are usually homeowners and condemnation actions where you get a new judgment that is somewhere between the amount of damages that the jury heard. So to apply the cases that you've cited on page 28 of your blue sheet, the other side wouldn't get zero. They would get somewhere between 70 and 100. I don't think I agree with that. I think, like, for example, in the Texas Supreme Court case of justice, the Court actually addressed this issue of what do you do when the market value evidence — I'm sorry, when there's insufficient market value evidence. And in that case, for example, the Court grappled with whether to just simply render judgment or to remand it. It chose to remand it, but only because in that case the Court said it had created new law or it had reinterpreted law in a new way. And in equity, it should be remanded to the Court to reconsider the issue. Well, what would be the best case where — that you would have under Texas law where there's evidence that the value is between A and B, the jury picks a number that's not between A and B, and the judgment of the Court is you get zero? I don't know the case standing here right now that would answer that question. I know we've cited a litany of cases in our brief that address the issue of damages falling outside the range presented to the jury. And I believe in those cases the answer is you have legally insufficient evidence, you're outside the jury's range, and therefore you take nothing. I don't think you get to go back and say we're going to conform the judgment to some number between what was presented when the jury doesn't answer the question that it's within that range. Well, that's what happens in the condemnation cases, right? It may. It may. In these cases, and especially when we're talking about market value of damages, the issue here, that doesn't seem to be what the Texas courts are doing. It looks as though they're either going to render judgment or they're going to remand if they conclude that there's some reinterpretation or change of Texas law. Counsel, if an expert opinion is not required, and I think you concede that there's no need for an expert opinion, it might have been better had they had one, but if an expert opinion isn't required, and if damages cannot be purely speculative, isn't there — aren't we looking just for sufficiency of evidence for the jury to have hung its hat on in the record, some type of testimony, whether it's — well, we don't think it's 70 or 100, but it might be 25. Doesn't the jury have that latitude to take all of the evidence into account and come up with a number that is at least sufficient based on the record? I don't think they do. I think they have latitude to pick a number that is between the range of legally sufficient evidence. Let me give you an example. If I purchase a home and I get a mortgage for that home, let's say I put $1 down and the bank finances the rest. I think if you apply this case the way that United My Funds asks you to, then suddenly by virtue of that transaction, the range of evidence is $1 up to whatever they argue. And that's not what this exception to the rule, this property interception to the rule is meant to do. It's meant to say that where you have to have an expert in this particular type of value situation, you can have a property owner instead of a fully qualified expert witness. Now, to go back to your question, I believe that if the range of legally sufficient evidence is from A to B, then you're right. The jury gets to pick. But the range of legally sufficient evidence did not include $25,000. $25,000 was a check that was written from click marks to the floor. Period. That's not sufficient evidence of market value, which is the proper measure of damages here. Now, with that said, I want to turn to the issue of attorney's fees. In short, Mr. Mubedin gets three bites at the apple here. First, we're asking you to reverse, and so he would be a prevailing party on that ground. Second, he prevailed on a separate claim under the Texas Theft Liability Act for theft of real property. And the courts are clear. If you are entitled to your attorney's fees, even if you lose on other claims, including other Texas Theft Liability Act claims. And then finally, he prevailed on a claim for conspiracy to commit theft. And the case that United My Funds relies on, Brinson Benefits, is actually the case that supports the conclusion that Mr. Mubedin should receive his attorney's fees for prevailing on the conspiracy claim. Now, I won't go into too much detail on this, just in the interest of time, unless the Court has questions. But I think what is important to note here is that the issue of the... Just for a bit of brevity, your argument on this issue, and I thought about it immediately when I got into this case, was after someone kills his parents and then at sentencing throws himself on the mercy of the court as an orphan. It just seems a big, big stretch for the jury having returned damages on the theft claim and on the money-hadn't-received claim for you to come in and saying your client should receive attorney's fees. I understand that. And the reality is that Texas law declares otherwise. Texas law is clear that a prevailing party shall receive his or her fees. Texas law, interpreted by the courts in Texas, is clear that that applies even if you lose on one Texas Theft Liability Act claim and prevail on the other. I understand where you're coming from. And, of course, we contend that Mr. Mubedin shouldn't, the verdict, I'm sorry, the judgment against him should be reversed for both money-hadn't-received and Texas Theft Liability Act. But notwithstanding that, the reality is that United My Funds pursued a claim against Mr. Mubedin for stealing real property. That claim was legally flawed. And it didn't go to the jury. The district court recognized that, and it entered a final judgment dismissing that claim with prejudice. Are there any cases where, and I guess this is akin to what Judge Barksdale just commented on, are there any cases where a party prevailed on, let's say, an unfair trade practice claim that does have a fee-shifting provision but lost on the corresponding, let's say, a fraud or a breach of contract claim, if they're all pled together and the standard for the claim is different, and you prevail on that, you would normally invoke the fee-shifting provision. But you lost on the other two. Are any cases come to mind where that happened? I don't know with respect to unfair trade practices, unfortunately. I do know that with respect to the Agar case, which I believe was from 2019, Texas Supreme Court, they acknowledge a similar issue involving other claims for breach of contract that had been included in the case. And the Court said the same thing that I'm saying. If you lose on the theft liability, I claim, or I'm sorry, if you prevail on that claim and you lose on others, you still get your fees. There is no other language in the statute, and the courts have said the language is clear, unequivocal. If you prevail, you get your fees. Now, finally, I'd like to shift to this money had and received claim. The takeaway here is that Mr. Moody never had or received any money, period. And this is a claim in equity. It's important to remember that. It's a claim that's only goal is to restore the money from the party who shouldn't have it to the party that should have it. It doesn't punish, and it's not meant to make someone whole at the expense of another. It's just meant to go get the money and give it back. And that's all it's used for. And here, every dollar from this transaction went for the benefit of Unitex, not Mr. Moody. I think this is an issue of wrong party. Mr. Moody did not receive the money. He did not Unitex could pay the rent. All of this benefited Unitex, a company that James Yu, the owner of United My Funds, purports to own 100 percent of in Federal tax returns. All right. Mr. Champion, thank you. You have five minutes reserved for rebuttal. Thank you. We'll hear from Mr. Martin now on behalf of United My Funds, LLC. May it please the Court. Xerxes Martin on behalf of United My Funds. This appeal is really attempting to stretch the law as far as possible to escape the theft and misappropriation that occurred and the underlying facts of this case. The district court's order denying the appellant's judgment notwithstanding the verdict and denial of their attorney's fees should be affirmed. One quick thing that I want to address first that seems to kind of, I guess, get lost in translation is this number of $25,000 that the jury awarded as damages to United My Funds from Moobideen. The total amount that the jury awarded for fair market damages was $50,000. They did $25,000 attributed to Moobideen and $25,000 to the other defendant, Chandana Pereira. So this $25,000 is a little bit skewed. Was there any argument that it should be apportioned individually or did the jury just decide that that was the case? The jury put $25,000 in both blanks. And so with that, going to the testimony of Mr. Al-Shayef, he testified that he was a manager of this store. He had extensive history in the, he didn't necessarily testify to having all sorts of experience in the convenience store business of this and whatever. He testified he had been working in convenience stores since 2004. He has ample testimony, or ample qualifications to give this testimony on the damages of this inventory. Mr. Al-Shayef testified that he went to this store. He viewed the inventory. He had been told from about the third-party appraiser that it was valued at about $100,000. He said this looks more like $70,000 in inventory, based on his personal experience as managers of convenience stores since 2004. The jury came back with a damages amount well within the range of what the testimony was. As this panel brought up, there was varying numbers, varying amounts, varying testimony, and the jury's number that came back was within that range. What's the best evidence, you used the figure of 50, combining the two. What's the best evidence that the jury relied on for the 50 figure? So there's various payments that took place here. There's a $25,000 cashier's check. There's a check labeled for inventory. There's the $52,000, I think $244 cashier's check. There's also testimony from Mr. Al-Shayef saying that some of this might have had to do with some of the gas here. I wasn't quite sure how it all broke down, but the jury was presented with a range of numbers, and the jury came back with a reasonable number within that range. I agree with Judge Oldham, too, about how the proper remedy, if this panel says that while the number that the jury came back with doesn't make sense with the evidence provided, this is remanded for a trial on just damages alone. There is no case law to support a take-nothing judgment based on the evidence, but Mr. Al-Shayef was qualified to testify. He testified to being a manager of these convenience stores and this particular convenience store, and he testified that he did view the inventory. Going to the situation of the purchase price, fair market value, we're not dealing with a situation where it is real property or the valuation of a business, and with the passage of time, what is that property worth after depreciation or somewhat? We're talking about candy bars, sodas, and cigarettes in this store. He valued it, in his opinion, at about $70,000 when he was in there, and then the transaction occurred nearly contemporaneously with that value. So we're not dealing with the passage of time changing the value of this inventory. And so his testimony, whether it's purchase price or his assessment of the $70,000, it's ample, valid testimony for the jury to base its damages number on. Was there any written inventory or any documentation whatsoever that he relied on to come up with that number, or was it just sort of a best guess based on his experience of what might be found in that type of building? No written inventory. He presented at trial. He testified that he looked at the inventory, and that was his assessment. Now, Pereira was a non-appealing defendant, correct? Yes. And Pereira offered testimony about the value of the inventory. He did via his video deposition. He valued it at $100,000, I believe. What if any argument was made at trial or in the instructions or anything else about the fact that, in effect, that could be an admission against interest for him to say the inventory is worth $100,000? I think you have to look at it at the time that the valuation occurred, which would be that they were, Mr. Pereira and Mr. Mubedin, were wanting the highest value at that time because they were selling or appearing to be selling this. Was that for the jury to determine? Credibility? Credibility is for the jury to determine. But it would be a statement against interest if he had not made that representation for the timing of the transaction of the gas station at that time. I think if he valued it much lower, that would be a statement against interest at a later time. I now want to address the prevailing party on the Texas Theft Liability Act. The case law regarding the TTLA states each person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees. We are here on one suit. We are not here on multiple suits. There was one claim under the TTLA pled in this action, two theories of liability. The case law, specifically the Brown case, holds that we are entitled to the fees, we're entitled to the judgment, and Mubedin is not a prevailing party under the law. And I think it's, I'm sorry, I said Brown, Brinson Benefits is the proper case, which is the case that the district court relied upon. That case is the most analogous and just like this case to rely upon. In that case, there was one section of the TTLA pled, there was two theories of damages, the court found or the jury found that there was a theft that took place and held it appropriately. Regarding the money had and received claim, the appellant wants this court to find that someone's attorney and business partner is somehow an independent third party in the receipt of this money. And that just cannot be just in the law. And furthermore, an attorney and business partner acting at his sole direction. The testimony at trial was he was doing what he was asked, no question, as in the attorney and business partner. Under this logic, a person could legally fraud someone by not actually accepting the money from the victim and say, direct it to my attorney, and then that attorney can send it to wherever the money is, and I can say, hey, my attorney touched it, I didn't touch it, and it didn't go to my benefit. And that just cannot be upheld in the law. In this case, the evidence is clear that Mubedin instructed the money to go to his attorney, his business partner, and sent to Sunoco on behalf of Unitex to pay off debts. But Mubedin was working with that transaction. And the money at issue was United My Funds money. United My Funds was deprived of that money in this case. Regarding the attorney-client relationship as well, and arguments in the briefs about escrows, there's zero evidence in the record of Mr. McCullough acting as an escrow in this case. Nothing. There is testimony on their hand from Mr. Mubedin and Mr. McCullough that Mr. McCullough was his attorney. There's no presumption that there was an attorney-client relationship in this case. The evidence is clear that there was an attorney-client relationship going on here. That is all of the argument. I really have to address the arguments made by appellant. I am happy to answer any questions the panel may have. Thank you, counsel. Mr. Champion, you have five minutes of rebuttal time. I want to start by going back to the issue of money had and received, an issue that I didn't quite fully discuss earlier. What United My Funds is arguing is that there's some agency law in Texas that changes the outcome of this claim. And I don't think that's appropriate. No Texas court has ever reached the conclusion that you can hold a principal liable for the money had and received. And I think that's extremely obvious because you're just trying to get the money back. You're not trying to impute liability to someone else. And I think the other issue with this argument, too, is that the jury did not find that Mr. McCullough held the money or received the money. It didn't reach that finding. And if we're going to apply agency law, what we have to do is we have to find that the agent committed some tort and then apply agency principles to impute that liability to the principal. And we don't have those findings. We don't have the finding of the tort by Mr. McCullough or in this case, this claim in equity here of having money. And we certainly don't have any findings that Mr. McCullough was the agent of Mr. Moobity. The argument that he was an attorney and therefore What do you mean findings? The jury wasn't asked to find specific aspects of all of this, was it? It wasn't. And I think that's a problem is that Did your side ask for more of a special verdict? No. Where would these findings be reflected? I think the problem is that this case was Where would these findings be reflected? It would have been if they had pled an agency relationship and then this is what the case was. You said there were no findings as if the jury did not find a specific aspect. And I'm asking you, since you didn't request some special interrogatory type verdict, how do we know there weren't findings? You're correct. And I think the problem here is that it was an ambush argument made after the judgment had been entered or after we had, you know, filed our motion for renewed judgment as a matter of law. The issue of agency was never addressed at trial. It was never addressed in pleadings or the pretrial order. Well, apparently, did you try the case? I did. Well, apparently you weren't concerned about that at trial. Because it was not an issue at trial. It had never been presented. And to be clear, the verdict form asked whether Hisham Moobideen held this money or received this money. And so there wasn't an interrogatory asking the jury whether Mr. McCullough, a third party, held or received the money, which, of course, I think would trigger an agency argument. This was never presented to the jury in the verdict form. And this is why I don't think it supports the verdict now. Agency law simply doesn't get us there. I want to go back now to the issue of damages. United My Funds argued that damages was really $25,000 as to Pereira and $25,000 as to Moobideen. If you read the verdict form, the jury was only asked what the value, market value, I'm sorry, of the inventory was. It didn't ask, the verdict form didn't ask the jury to apportion damages between the defendants or liability between the defendants. And so what we're left with is a finding by the jury that the market value is $25,000. Well, I've read the verdict form, and I just recall seeing where the jury returned $25,000 against one and $25,000 against the other. That's correct. And that was the answer that was given to the question, what was the market value of the inventory? Now, United My Funds also argued earlier that we weren't dealing with the passage of time between Mr. Alshayef's supposed evaluation and the appropriation. That's not supported in the record. In fact, there's no evidence in the record to suggest how much time elapsed between the date of this supposed appraisal, the date that Mr. Alshayef visited one store and apparently viewed the inventory, and the date of the appropriation. Counsel, let me ask you, getting back to the jury verdict form, and you're right, it says market value of inventory, $25,000, but it says as to each of the defendants, Pereira and Moubidin, $25,000 is the answer to the same question, market value of the inventory. But the verdict form asks the question twice, once as to each defendant. Was there any kind of post-trial motion to clarify whether it's 50 total or whether it's the same 25? There was no post-trial motion. The judgment entered by the court was for $25,000 as to each of the parties. No one asked the court to clarify whether it was a $50,000 award, joint and several, for example. Finally, I'll just touch on this issue of attorney's fees. United MyFunds argued earlier that you have to win the suit to be entitled to your fees. That's just completely contrary to every case we've cited in our brief. It's very clear under Texas law that you can win simply one claim under the Texas Theft Liability Act, receive your fees even if you lose on everything else. All right. Thank you. Thank you. Thank you both. We have your arguments and the matter will be considered submitted. Thank you.